# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-1015

MICHAEL ALLEN LAMBERT,

*Petitioner-Appellant*,

v.

DANIEL MCBRIDE, Superintendent,

*Respondent-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 01 C 864—**Larry J. McKinney**, *Chief Judge.*

———————

ARGUED OCTOBER 23, 2003—DECIDED APRIL 7, 2004

———————

Before RIPPLE, KANNE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Michael Lambert appeals from the denial of his petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. He does not dispute that his Indiana conviction for the murder of police officer Gregg Winters is valid, but he contends that the death sentence he received was unconstitutionally imposed. The facts are grisly.

Lambert was drinking heavily one December day in 1990. That night, he went to a bar on the south side of Muncie, Indiana, and drank even more. He became drunk; a patron of the bar said he was "dancing around wild-eyed." A little

after midnight, Muncie police were dispatched to a property-damage accident. When they arrived on the scene, they found a truck without a driver.

A short time later, Officer Kirk Mace saw a man trying to crawl under a car. When Mace investigated, the man, who turned out to be Lambert, said he was going to go to sleep under the car. Lambert was lightly dressed; the outside temperature was in the teens and it was snowing. Mace concluded that Lambert was drunk and arrested him for public intoxication. Lambert was subjected to a quick "pat-down search," handcuffed, and placed in the back of a squad car. A single officer, Officer Winters, started to drive Lambert to the jail, which was about 15 minutes away. What happened during that short trip ended Winters' life and altered, with a sentence of death, Lambert's life as well.

A few minutes into the trip, a patrol car carrying two deputy sheriffs approached Officer Winters' squad car, which was proceeding from the opposite direction. Suddenly, Winters' patrol car slid off the road and came to rest in a ditch. Why? Well, as revealed during the trial, what happened was chilling.

The "pat-down" search of Lambert had come up dry for weapons, but it was tragically incomplete. Lambert had a gun somewhere on his person, one that he stole from his employer 8 days earlier. During the ride to the jail, Lambert, despite being handcuffed, managed to get the gun and fire shots into the back of Officer Winters' neck and head. When the two deputies got to the scene, Winters was immobile behind the steering wheel and Lambert's pistol was on the floor. An autopsy revealed that Winters was struck by five bullets. He died in a hospital 11 days later.

Lambert was subsequently charged with murder. The charged aggravating circumstance, which made him eligible for the death penalty, was that the victim was a police officer killed in the line of duty. Indiana Code § 35-50-2-

9(b)(6). Lambert was convicted by a jury, and the case proceeded to a sentencing hearing before the same jury. During this hearing, under Indiana law, a jury considers "all the evidence introduced at the trial stage of the proceedings, together with new evidence presented at the sentencing hearing." § 35-50-2-9(d). When these proceedings (prior to the 2002 amendments to the statute) occurred, the judge was not bound by the jury's recommendation, and prior to pronouncing sentence she could receive victim-impact evidence. Indiana Code § 35-50-2-9(e). In this case, however, it was the jury who heard victim-impact testimony—from the police chief, Officer Winters' brother, and from his widow, Molly Winters. The jury recommended a death sentence, which the judge then imposed.

Lambert appealed his conviction and sentence to the Indiana Supreme Court, which remanded the case to the trial court to reconsider evidence of intoxication as it was related to the penalty determination. The trial judge once again sentenced Lambert to death, and this time the Indiana Supreme Court affirmed both the conviction and sentence. *Lambert v. State*, 643 N.E.2d 349 (Ind. 1994). Lambert sought rehearing, arguing that the court was wrong to find that he waived his claim that the trial judge improperly admitted the victim-impact testimony. The Indiana Supreme Court, on rehearing, held that the victim-impact evidence was improperly admitted and that its admission was not harmless error. The court found, however, after itself weighing the factors in aggravation and mitigation, that the death sentence was proper. *State v. Lambert*, 675 N.E.2d 1060 (Ind. 1996). Next, Lambert filed a petition for state postconviction relief in the trial court. After an evidentiary hearing, the court denied relief. Lambert once again appealed to the Indiana Supreme Court, which affirmed the denial of postconviction relief, *Lambert v. State*, 743 N.E.2d 719 (Ind. 2001). A rehearing request was also denied. Along the way, petitions for writs

of certiorari were presented to the United States Supreme Court and denied. *Lambert v. Indiana*, 520 U.S. 1255 (1997); *Lambert v. Indiana*, 534 U.S. 1136 (2002). Lambert's next stop was the United States district court, where he filed a petition for a writ of habeas corpus. The district court denied his petition, and this appeal followed.

Because Lambert's petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the provisions of that Act govern our review. *Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, if a constitutional claim was adjudicated on the merits by the state court, a federal court may grant habeas relief on that claim only if the state court decision was "contrary to" or "involved an unreasonable application of clearly established federal law as determined by the Supreme Court," or if it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). A state court decision is "contrary to" established Supreme Court precedent when the state applies a rule different from governing Supreme Court cases or confronts a set of facts that is materially indistinguishable from those of a Supreme Court decision and arrives at a different conclusion. *Williams v. Taylor*, 529 U.S. 362 (2000). If the case involves an "unreasonable application" of Supreme Court precedent, we defer to reasonable state court decisions. *Bell v. Cone*, 535 U.S. 685 (2002). State court factual findings that are reasonably based on the record are accorded a presumption of correctness, and the state court's findings of facts must be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Denny v. Gudmanson*, 252 F.3d 896 (7th Cir. 2001).

Lambert contends that the Indiana Supreme Court decision, where it reweighed the statutory factors in aggravation and mitigation and then permitted his death sentence to stand, is contrary to or an unreasonable application of *Clemons v. Mississippi*, 494 U.S. 738 (1990).

Quite obviously, Lambert's row to hoe on this issue would be smoother if he could rely on *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002). As he recognizes, however, that argument is foreclosed to him, as it was in *Trueblood v. Davis*, 301 F.3d 784 (7th Cir. 2002), where we observed, without an extended discussion, that the Supreme Court has not held *Ring* to be retroactive to cases on collateral review. *See also Szabo v. Walls*, 313 F.3d 392 (7th Cir. 2002). We will now add a bit to that discussion.

In *Ring*, the Supreme Court held that the Sixth Amendment jury trial guarantee extends to the determination of any fact, other than a prior conviction, that increases the maximum punishment for first degree murder from life imprisonment to death. Essentially, this is an application, perhaps more accurately an extension, of the rule announced earlier in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Because the rule in *Apprendi* is not retroactive, *Curtis v. United States*, 294 F.3d 841 (7th Cir. 2002), it stands to follow that the rule in *Ring*, an *Apprendi* child, is not retroactive for the same reasons. Two circuits, the Tenth and Eleventh, have expressly held that *Ring* is not retroactive to cases on collateral review. *See Cannon v. Mullin*, 297 F.3d 989 (10th Cir. 2002), and *Turner v. Crosby*, 339 F.3d 1247 (11th Cir. 2003). These decisions make the convincing case that first *Apprendi*, and then *Ring*, only established new rules of criminal procedure. They did not involve substantive changes in the law. And *Teague v. Lane*, 489 U.S. 288 (1989), holds that new constitutional rules of criminal procedure do not apply to cases that are final before the new rules are announced. *Teague* does provide two exceptions to this general rule. First, a new rule applies retroactively if it places a class of private conduct beyond the power of the criminal lawmaking authority to proscribe or punish. Second, a new rule applies retroactively if (1) it is a watershed rule that "alters our understanding of the bedrock procedural elements that must be found to vitiate the fairness of a particular convic-

tion," *id.* at 311, and (2) under the new rule "the likelihood of an accurate conviction is seriously diminished," *id.* at 313. Today we reaffirm what we held in *Trueblood* and *Szabo* and join the Tenth and Eleventh Circuits in expressly holding that *Ring* does not fit under either of the *Teague* exemptions to non-retroactivity.

In reaching this conclusion, we are mindful of the contrary view recently expressed by the Ninth Circuit in *Summerlin v. Stewart*, 341 F.3d 1082 (9th Cir. 2003) (en banc), *cert. granted*, No. 03-526 (U.S. Dec. 1, 2003). With all due respect, however, we cannot agree with that circuit's view that *Ring* is a substantive change in the law exempt from *Teague*'s retroactivity bar. And so we return to Lambert's claim for relief in reliance on *Clemons*.

*Clemons* held that it was constitutionally permissible for a state appellate court to uphold a jury-imposed death sentence that is based in part on an invalid aggravating factor by reweighing the aggravating and mitigating evidence or by harmless-error review. Lambert argues that the Indiana Supreme Court could uphold the death sentence in his case either by finding that the admission of the victim-impact testimony was harmless (the court specifically found that it was not) or by reweighing the aggravating and mitigating factors. But, he argues, *Clemons* does not allow them to engage in both harmless-error review and a reweighing: Having said the admission of the testimony could not be considered harmless, the court was required to remand the case for resentencing, rather than to perform the weighing itself. In other words, Lambert says *Clemons* allows a court to do one or the other, not both.

*Clemons* involved a Mississippi scheme where the jury weighs the mitigating and aggravating factors. The Court noted that its previous holdings had considered the circumstance in which an aggravating factor made a defendant *eligible* for the death penalty. In that circumstance, invalidation of one factor did not necessarily require an

appellate court to vacate the death sentence. The Court said, however, that it had not previously determined the significance of the invalidation of a particular aggravating circumstance under a statutory scheme in which the judge or the jury was specifically instructed to weigh statutory aggravating and mitigating circumstances in deciding whether to *impose* the death penalty. What the Court had to consider was whether, in a circumstance in which the jury was charged with weighing the factors and a factor was found to be invalid, an appellate court could nevertheless uphold the death sentence. It was in that context that the Court stated that the death sentence could be upheld either through harmless-error analysis or by reweighing the factors. Reweighing by the appellate court was allowed even though, under the state statute, the sentencing decision was committed to the jury.

If reweighing can be done by the appellate court when the jury is charged with the sentencing decision, it seems clear to us that when the jury's determination is only advisory, the appellate court has latitude to reweigh the factors. As we said, at the relevant time, Indiana had a hybrid death penalty scheme, in which a jury rendered an advisory verdict but the judge made the ultimate sentencing determination. What happened here, according to the Indiana Supreme Court, is that the admission of the victim-impact evidence was error and it was not harmless. That would mean that the jury's recommendation was flawed. But, under what was then the Indiana scheme, the jury's recommendation was just that: an advisory recommendation. Under those circumstances, it is not an improper extension of *Clemons* to say that the appellate court could reweigh the appropriate aggravating and mitigating factors and allow a death sentence to stand.

Lambert tries to bolster his argument that the reweighing was inappropriate by pointing out that a dissenting member of the Indiana Supreme Court found resentencing by the appellate court to be inappropriate. 675 N.E.2d at 1066. The

dissenting justice, however, based his dissent on provisions in the Indiana Constitution, not precedent from the United States Supreme Court. Furthermore, he concurred in the later decision, upholding the denial of postconviction relief on this issue. 743 N.E.2d 719.

As a final word on this point, we note that our decision in this matter will soon become a fossil. The Indiana statutes were revised in 2002. Indiana Code 35-50-2-9(e)(2) now states that if "the jury reaches a sentencing recommenda-tion, the court shall sentence the defendant accordingly." Furthermore, as we noted, the procedure followed in this case is called into serious question by *Ring v. Arizona*, 122 S. Ct. 2428 (2002). But based on Lambert's argument and the law as it applies to him, we find no error in how his death sentence was treated by the court.

That being said, Lambert's remaining arguments become somewhat meaningless; they go to matters which allegedly could have prejudiced the jury at the death penalty hearing. Because the jury recommendation has already been deter-mined to be invalid, we will look only briefly at the remain-ing arguments.

First, Lambert contends that his counsel was ineffective by failing to object to the presence of uniformed police officers as spectators in the courtroom during the trial. He says that the presence of the officers is a violation of *Holbrook v. Flynn*, 475 U.S. 560 (1986). The argument fails. *Holbrook* involved officers stationed in the courtroom as guards, not spectators. And, more importantly, their presence, which was at least as apparent as the officers in this case, was not found to be prejudicial. In Lambert's case, the number of officers present varied from time to time, but during trial there were from 6 to 8 present, and at crucial times that number rose to 15. They were seated in the spectator section, which in this particular courtroom was separated from the proceedings by a transparent barrier, similar to that in a hockey rink. Apparently, as they entered the courtroom the jurors could see the spec-

tators, but once they were in their seats, their backs were to the spectator section. Finally, there was no indication that the officers were in any way trying to intimidate the jurors. Furthermore, trials are open to the public, including to police officers, and the state trial judge concluded that he would have overruled any objection to the presence of the officers. 743 N.E.2d at 732. That counsel did not object to their presence does not render his performance deficient under the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984).

More importantly, however, the presence of the officers could not have any effect on the Indiana Supreme Court, who ultimately allowed the death sentence to be effective.

Lambert also raises an issue of prosecutorial misconduct in statements made in closing argument at the penalty hearing. In the district court, the issue was framed as an issue of incompetence of counsel for failing to object to the argument. We will consider the issue in that context. As a freestanding argument that there was prosecutorial misconduct, the argument runs into procedural problems involving waiver and procedural default.

Lambert contends that his counsel should have objected to remarks made by the prosecutor. Those remarks included a statement that Justices Rehnquist and White said they believed death sentences to be an appropriate protection for police officers and described police officers as "foot soldiers of society's defense of ordered liberty." The prosecutor read a poem that was presented at Officer Winters' funeral and argued that the death penalty was appropriate because police officers are soldiers in a war against crime. The Indiana Supreme Court found that these arguments "pushed the bounds of zealous advocacy," 743 N.E.2d at 737, but concluded that the trial court would not have had to sustain an objection to them. In evaluating a claim of

prosecutorial misconduct, the relevant inquiry is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). We cannot say that the conclusion of the Indiana court is contrary to either case.

Lambert also contends that his attorney should have objected to comments that mitigation cannot override the aggravating circumstances of the case. Lambert seems to contend that this was a statement that, in every case where a police officer is killed, this aggravating circumstance overrides any mitigating evidence. It is not clear that the prosecutor was attempting to state a principle of law. The argument was impassioned but not necessarily objectionable.

Under *Strickland*, we must note that there may very well be strategic reasons for counsel not to object during closing arguments. Counsel may have been trying to avoid calling attention to the statements and thus giving them more force. As it was, the comments were brief responses to arguments made by Lambert's attorneys.

The Indiana Supreme Court concluded that counsel's performance was not deficient, and we cannot find the conclusion to be an unreasonable application of Supreme Court precedent.

Finally, Lambert contends that the decision of the Indiana Supreme Court is contrary to *Brady v. Maryland*, 373 U.S. 83 (1963), which requires the prosecution to disclose favorable evidence that is material to a defendant's case. That evidence was that, shortly before trial, the State had agreed to Richard Garske's request for sentence modification in exchange for his testimony. Garske was incarcerated in the county jail at the same time as Lambert, and he testified for the State. He said Lambert told him it "was just

a cop. Well, it was just a pig is what it was. Not a cop." During cross-examination, counsel asked Garske about his criminal record but not about possible deals he had with the State in exchange for his testimony. Lambert argues that the cross-examination would have been more effective had he been given the withheld evidence that he could have used to impeach Garske's testimony. That he wasn't told constitutes a *Brady* violation, he argues.

Lambert also contends that had he been given the information, he could have called other prisoners to challenge the basis for Garske's testimony. For instance, Bruce Carpenter, a fellow inmate, testified in the postconviction proceedings that he told Lambert "to keep his mouth shut about his case . . . because everybody in here wanted out, and his case was certainly a way for everybody to get out." Carpenter also testified that he never saw Lambert talking to Garske. Another inmate, William Barnhouse, testified in the postconviction hearing that he never heard Lambert discuss his case.

As a preliminary matter, it is difficult to see how any of the testimony from other inmates is dependent upon knowledge that Garske might receive a sentence reduction. The inmates could have been called regardless of whether Lambert was given the information. Carpenter's statement that Lambert should keep his mouth shut would be relevant whether or not Garske had a deal. Carpenter's statement that he never saw Lambert talking to Garske and Barnhouse's statement that he never heard Lambert discussing his case really prove not much of anything, and, more importantly, they are not dependent on any deal Garske may have had, even if he had one prior to testifying. More importantly, that there was no explicit agreement between the State and Garske at the time he testified is a factual determination, and factual findings by the Indiana courts on the point are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). We agree with

the district court that Lambert did not overcome the presumption by clear and convincing evidence.

For these reasons, the decision of the district court denying Lambert's petition for a writ of habeas corpus is AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*